**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL | § | |
| DEMOGRAPHICS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-06-0342 |
| | § | |
| THE SF NEWSPAPER COMPANY, | § | |
| L.L.C., EXIN, L.L.C., PAN ASIA | § | |
| VENTURE CAPITAL CORPORATION, | § | |
| and FLORENCE FANG, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

International Demographics, Inc. ("IDI") filed this suit in Texas state court against

The SF Newspaper Company, L.L.C. ("SF Newspaper"), ExIn, L.L.C., and Pan Asia Venture

Capital Corporation ("PAVCC"), Delaware companies with their principal places of business

in San Francisco, California.  IDI also sued Florence Fang, a California resident.  In the

Texas court, IDI filed a Petition to Compel Arbitration and Motion to Stay Proceeding.  The

defendants removed on the basis of diversity jurisdiction and filed motions to dismiss for

lack of personal jurisdiction, (Docket Entry Nos. 11, 24), to which IDI responded, (Docket

Entry Nos. 19, 33), and the defendants replied, (Docket Entry Nos. 27, 38).  IDI also filed

motions to determine the arbitrability of claims, (Docket Entry Nos. 9, 26), to which the

defendants responded, (Docket Entry Nos. 20, 31), and IDI replied, (Docket Entry Nos. 23,

37).  After reviewing the motions and responses, the record, and the applicable law, this court

grants the motions to dismiss for lack of jurisdiction and, as a result, does not decide the arbitrability of the claims.  The reasons for this decision are discussed below.

## I.    Background

SF Newspaper is a Delaware limited liability company with its principal place of business in San Francisco, California. (Docket Entry No. 11, Ex. A at ¶¶ 5–6).  The only member of SF Newspaper is Anschutz Print Media Company, which is organized under Delaware law and has its principal place of business in Denver, Colorado.  (*Id.* at ¶ 6).  SF Newspaper did not exist as a corporate entity before February 10, 2004.  SF Newspaper is qualified to do business only in Delaware and California.  It has no office in Texas, maintains no files in Texas, has no registered agent in Texas, has no Texas employees, owns no real or personal property in Texas, and has no bank account in Texas.  (*Id.* at ¶¶ 7–14)**.**

Florence Fang is an individual who resides in California.  (Docket Entry No. 31, Ex. A at ¶ 1).  Fang has never done business in Texas, has no office in Texas, does not own real or personal property in Texas, has no bank account in Texas, and has not visited Texas for any reason in the last ten years.  (*Id.* at ¶¶ 4–8).  In her affidavit, Fang testified that, "There is no such entity as the 'Fang Family Publishing Group,' nor have I ever authorized anyone to do business under that name on my behalf in Texas or elsewhere."  (*Id.* at ¶ 9).

ExIn is a limited liability company organized under Delaware law with its principal place of business in San Francisco, California.  (Docket Entry No. 31, Ex. A at ¶¶ 22–23).  ExIn has no offices in Texas, maintains no registered agent or files in Texas, has no Texas employees, has no real or personal property in Texas, and has no bank accounts in Texas.

(*Id.* at ¶¶ 24–30).  Florence Fang is a member of ExIn.  (*Id.* at ¶ 21).  According to Fang, ExIn is in the final stages of dissolution and has not had any active business pursuits since the sale of the *San Francisco Examiner*, *San Francisco Independent*, and *San Mateo Independent* to SF Newspaper in February 2004.  (*Id. at* ¶ 22).  In Fang's affidavit, she stated that "ExIn LLC has not authorized anyone to do business under the name 'Fang Family Publishing Group' on its behalf in Texas or elsewhere."  (*Id.* at ¶ 31).

PAVCC is a Delaware limited liability company with its principal place of business in San Francisco, California.  (*Id.* at ¶¶ 11–12).  PAVCC has no Texas office, no Texas employees, and keeps no files, bank accounts, or real or personal property in Texas.  (*Id.* at ¶¶ 13–19).  PAVCC is registered to do business only in California.  (*Id.* at ¶ 13).  Fang is an officer of PAVCC.  (*Id.* at ¶ 10).  According to Fang, PAVCC "has not authorized anyone to do business under the name 'Fang Family Publishing Group' on its behalf in Texas or elsewhere."  (*Id.* at ¶ 20).

IDI is a Texas company that contracts with print, radio, and television media to provide licenses and training for the use of data collected by media audit reports and surveys.  Richard Gardner is the vice-president of IDI and works out of the company's California office.  Gardner contends that ExIn, PAVCC, and Fang conducted business as the Fang Family Publishing Group.  (Docket Entry No. 12, Ex. 1 at  ¶ 2).

Between November 2003 and January 2004, Gardner engaged in negotiations with Daniel Payomo, Jr., who, according to Gardner, represented the Fang Family Publishing Group.  IDI hoped to provide licenses and training for several publications then owned by

ExIn, PAVCC, and what Payomo referred to as the Fang Family Publishing Group, including the *San Francisco Independent*, *San Francisco Examiner*, and *Asia Week*. (*Id.*). Payomo told Gardner that P. Scott McKibben, chief executive officer of ExIn, had to approve contract terms. Gardner arranged a meeting for himself, McKibben, Payomo, and Phil Beswick from IDI's Houston office. Gardner claims that after the meeting, which occurred in November 2003, McKibben approved IDI's bid to provide license and training for the three publications and instructed Gardner to "deal directly with Mr. Payomo on behalf of ExIn, PAVCC, and Fang on the terms of the license." (*Id.* at ¶ 3).

Later that month, Gardner had lunch with Payomo to discuss terms. Afterward, Gardner drafted a letter setting out proposed terms. (*Id.* at ¶ 4). The letter addresses Payomo as "Vice-President Sales, FANG FAMILY PUBLISHING GROUP." (*Id.* & Docket Entry No. 35, Ex. 4). In his affidavit, Gardner states that he addressed the letter in this way "because Mr. Payomo led me to understand that the Fang Family Publishing Group was the appropriate collective name for Exin, PAVCC, and Fang." (Docket Entry No. 34, Ex. 1 at ¶ 5).

Payomo telephoned Gardner and accepted the proposed contract terms. (*Id.* at ¶ 5). Gardner's office began preparing the Media Audit Lease Agreement ("Media Agreement"). On January 8, 2004, Robert A. Jordan signed the Media Agreement on behalf of IDI and Payomo signed on behalf of the Fang Family Publishing Group. (*Id.* at 7; Docket Entry No. 1, Ex. A). Gardner states that "IDI relied upon the Fang Family Publishing Group as being the represented trade name of Exin, PAVCC and Fang." (Docket Entry No. 34, Ex. 1 at ¶ 7).

4

"Once executed by the parties, the Media Agreement was returned to IDI in its Houston, Texas offices."  (*Id.* at ¶ 8).  The only signatories to the Media Agreement are IDI and the Fang Family Publishing Group.

In her affidavit, Fang states that after December 2003, "no one was authorized to enter into new contracts on my behalf or on behalf of the selling parties (ExIn, Pan Asia) relating to the *San Francisco Examiner* or other papers being sold to San Francisco Newspaper Company, LLC."  (Docket Entry No. 31, Ex. B at ¶ 7).  Fang also states that "Fang Family Publishing Group" is not a trade name used by her, ExIn, or PAVCC.  (*Id.* at ¶ 6).

Under the terms of the Media Agreement, IDI was to provide training and consumer data relating to the publication of the *San Francisco Independent*, *San Francisco Examiner*, and *Asia Week* within the San Francisco area. (Docket Entry No. 12, Ex. 3).  The Media Agreement included a forum-selection and choice-of-law provision that stated: "[FFPG] and [IDI] agree that any lawsuit between them may only be brought in either the state or federal courts located in Harris County, Texas having jurisdiction over such disputes . . . . [and that] enforcement shall be governed by the laws of the state of Texas without regard to its conflict of law rules." (Docket Entry No. 12, Ex. 3 at ¶ 13).  The Agreement also included an arbitration clause that reads:

> Any controversy, claim or dispute arising out of or relating to this agreement, it's [sic] breach or claimed breach shall be settled by arbitration administered by the American Arbitration Association in accordance with its Commercial Rules including Emergency Interim Relief Procedure and judgment on the award of the arbitrator(s) may be entered in any court that the parties have agreed shall be entitled to exercise jurisdiction over lawsuits between them.  This agreement to binding arbitration shall not prevent either party from seeking and receiving ex-

5

parte, interim and permanent injunctive relief, including orders enforcing the parties agreement to arbitrate.

(*Id.* at ¶ 14).  The Agreement further included an assignment-consent provision that stated: "The client may assign its rights or obligations to this agreement to another owner with prior written approval from International Demographics, which consent shall not be unreasonably withheld." (Docket Entry No. 12, Ex. 3 at ¶ 12).

On February 10, 2004, SF Newspaper came into existence as a Delaware limited liability company.  (Docket Entry No. 11, Ex. A at ¶ 14).  On February 18, 2004, SF Newspaper and Anschutz Printing Company (the sole member of SF Newspaper) purchased certain assets—mainly newspapers and other publications—from ExIn, PAVCC, and Florence Fang.  The Asset Purchase Agreement ("Purchase Agreement") transferred all assets and liabilities of various business entities, with several exceptions.  The Purchase Agreement included an assignment provision, which reads:

> Subject to the terms and conditions of this Agreement . . . the Selling Parties shall . . . sell, assign, convey, transfer and deliver to the Purchaser . . . and the Purchaser shall purchase and acquire from the Selling Parties . . . all of the Seller Group's right, title and interest in and to all property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, used, held for use, intended to be used or reasonably necessary to or required in the operation or conduct of the Printing and Publishing Business, other than the Excluded Assets.

(Docket Entry No. 11, Ex. A1 at ¶ 2.1).  The Media Agreement executed by IDI and the Fang Family Publishing Group was neither specifically listed in the asset schedules nor described under the Excluded Assets provisions.  (Docket Entry No. 11, Ex. A1 at ¶¶ 2.1(a)–(t),

2.3(a)–(q)).  The Asset Purchase Agreement also included a subject-to-consent provision
which reads:

> If any transfer or assignment by the Selling Parties or any other member of the Seller
> Group to, or any assumption by the Purchaser of, any interest in, or Liability under,
> any asset requires the consent of a third party, then such assignment or assumption
> shall be made subject to such consent being obtained.  To the extent any Assigned
> Contract may not be assigned to the Purchaser by reason of the absence of any such
> consent, the Purchaser shall not be required to assume any Assumed Obligations
> arising under such Assigned Contracts.

(Docket Entry No. 11, Ex. A1 at ¶ 2.2).  Following this Agreement, SF Newspaper began

publishing, and continues to publish, the *San Francisco Independent* and *San Francisco*

*Examiner*, but not *Asian Week*.  (Docket Entry No. 9 at ¶ 2.17).

On February 3, 2004, before the Purchase Agreement was entered into, IDI claims to

have delivered the Fall 2003 Media Report to Payomo, consistent with the Media Agreement.

(Docket Entry No. 12, Ex. 1 at ¶ 5).  After the Purchase Agreement was entered into, Gardner

claims to have dealt with SF Newspaper through Payomo and McKibben.  (Docket Entry No.

12, Ex. 1 at ¶ 5).

According to Gardner, until February 1, 2005, IDI and SF Newspaper maintained a

relationship under the Media Agreement.  (Docket Entry No. 34, Ex. 2 at ¶ 6).  Gardner

claims that IDI provided training to SF Newspaper personnel in SF Newspaper's San

Francisco and San Mateo offices on February 20, 2004, September 17, 2004, and during May

2004.  (Docket Entry No. 12, Ex. 1 at ¶¶ 6(a), 6(d), 6(i)).  Gardner was involved in meetings

and discussed new marketing strategies with SF Newspaper in May of 2004, and on

December 7, 2004.  (Docket Entry No. 12, Ex. 1 at ¶¶ 6(c), 6(j)).  IDI delivered to SF

Newspaper the Spring 2004 Media Report on September 1, 2004, and the Fall 2004 Media Report on January 28, 2005. (Docket Entry No. 12, Ex. 1 at ¶¶ 6(f), 6(k)). SF Newspaper issued checks to pay for the Fall 2003 and Spring 2004 reports on April 8, 2004, and September 15, 2004, respectively. (*Id.* at 6(b), 6(h)). On February 1, 2005, after IDI sent an invoice for the Fall 2004 Report, SF Newspaper asked to terminate the Media Agreement. (*Id.* at 6(l)). Gardner promptly responded by letter stating that "there is no basis to terminate the Media Agreement and that IDI would not agree to do so." (*Id.* at ¶ 6(n)). This litigation followed. The threshold issue is personal jurisdiction.

## II.    The Applicable Legal Standards

A plaintiff responding to a motion to dismiss for lack of personal jurisdiction bears the burden of demonstrating facts sufficient to support personal jurisdiction over a nonresident defendant. That burden is met by a *prima facie* showing; proof by a preponderance of the evidence is not necessary. *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002); *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000). "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Id.* "[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor." *D.J. Invs. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir. 1985) (quoted in *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990)).

8

In a diversity action, a federal court may exercise personal jurisdiction over a defendant to the extent permitted by the applicable state law. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 867 (5th Cir. 2001). The Texas long-arm statute, TEX. CIV. PRAC. & REM. CODE ANN. § 17.041 *et seq.*, confers jurisdiction to the limit permitted by due process. *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990); *see also Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 413 n.7 (1984); *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 424–25 (5th Cir. 2005). Due process limits the exercise of personal jurisdiction over nonresident defendants to cases in which a defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state, and the exercise of jurisdiction over that defendant does not offend "traditional notions of fair play and substantial justice." *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999) (quoting *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

A court may assert personal jurisdiction under a theory of either "general" or "specific" personal jurisdiction. Specific jurisdiction exists when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir. 1994) (citing *Helicopteros*, 466 U.S. at 414 n.8). A court may exercise specific jurisdiction if: (1) the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; and (2) the controversy arises out of or is related to the defendant's contacts with the forum state. *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir.

2004).  A court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice." *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 772 (5th Cir. 1988) (citations omitted).  If a defendant's contact with the forum "resulted from the defendant's conduct and created a substantial connection with the forum state, even a single act can support [specific personal] jurisdiction." *Ham v. La Cienega*, 4 F.3d 413, 415 (5th Cir. 1993); *see also McGee v. Int'l Life. Ins. Co.*, 355 U.S. 220, 223 (1957); *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332–34 (5th Cir. 1982).  "[M]erely contracting with a resident of a forum state," however, "is insufficient to subject the nonresident to the forum's jurisdiction." *Freudensprung*, 379 F.3d at 344 (quoting in part *Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 778 (5th Cir. 1986) (additional citations omitted)).

When the cause of action does not arise from or relate to the foreign defendant's purposeful conduct within the forum state, due process requires that the foreign defendant have engaged in continuous and systematic contacts with the forum state before a court may exercise general personal jurisdiction. *Helicopteros*, 466 U.S. at 414–15; *Bearry v. Beech Aircraft Corp.* 818 F.2d 370, 374 (5th Cir. 1987).  The plaintiff must demonstrate contacts of a more extensive quality and nature between the forum state and the defendant than those needed to support specific jurisdiction. *Dalton v. R & W Marine*, 897 F.2d 1359, 1362 (5th Cir. 1990).  "To exercise general jurisdiction, the court must determine whether 'the contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction.'"

*Holt Oil & Gas*, 801 F.2d at 777 (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1191 (5th Cir. 1985) (additional citations omitted)).

A forum-selection "provision in a written contract is *prima facie* valid and enforceable unless the opposing party shows that enforcement would be unreasonable." *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 299 (5th Cir. 2004); *Kevlin Servs., Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995). A forum-selection clause demonstrates a party's consent to jurisdiction in a specific forum. Absent a showing of fraud or overreaching in creating the clause, courts enforce the consent to jurisdiction. *See Kevlin*, 46 F.3d at 15.

### III.   Analysis

#### A.   ExIn, PAVCC, and Mrs. Fang

##### 1.   The Media Agreement and the Forum-Selection Clause

ExIn, PAVCC, and Florence Fang (the "Fang defendants") have moved to dismiss on the basis that they have no contacts with the state of Texas that would justify the assertion of personal jurisdiction and did not consent to jurisdiction in Texas. (Docket Entry No. 24 at ¶ 2). The Fang defendants deny that they have ever represented themselves collectively as the FFPG. (*Id.* at ¶ 12). The Fang defendants are not signatories to the Media Agreement. (Docket Entry No. 12, Ex. 3). IDI argues that, despite being nonsignatories, the Fang defendants are bound by the Media Agreement, including the forum-selection clause, under agency, alter ego, and direct benefits estoppel doctrines.

11

It is not uncommon for corporations or individuals to use "liability insulating entities" to enter into transactions. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 355 (5th Cir. 2003); *Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002). Courts have held that under some circumstances, a third party may be bound to a contract executed by such an affiliated entity. *Bridas*, 345 F.3d at 355. Both federal and Texas courts have recognized six theories under which a nonsignatory may be bound by a contract: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. MDL-1446, Civ.A. H-01-3624, Civ.A. H-04-0088, 2005 WL 3704688, *16 (S.D. Tex. Dec. 5, 2005) (citing *Bridas*, 345 F.3d at 356 (5th Cir. 2003); *In re Kellogg, Brown & Root*, 166 S.W.3d 732, 739 (Tex. 2005)).

IDI argues that the Fang defendants knowingly benefitted and exploited the contract, invoking the doctrine of "direct benefits" estoppel. IDI also argues that FFPG is an alter-ego of the Fang defendants. Finally, IDI argues that Payomo had the authority to contract on behalf of the Fang defendants under the FFPG trade name as an "ostensible" agent. (*See* Docket Entry No. 33). Each argument, and response, is examined below.

### a.  *The Direct-Benefits Estoppel Doctrine*

The "direct-benefits" estoppel doctrine cannot bind the Fang defendants to the Media Agreement. Although the "boundaries [of this theory] are not entirely clear," *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 134 (Tex. 2005), the doctrine is inapplicable to a nonparty defendant. The Fifth Circuit has adopted the "direct benefits" estoppel doctrine as part of

federal common law and has limited the doctrine to cases in which the "*nonsignatory [has] brought suit* against a signatory premised in part upon the agreement." *Bridas*, 345 F.3d at 361 (emphasis added). The Fifth Circuit does not apply the doctrine to cases in which the nonsignatory is being sued because in such cases, the nonsignatory does not exploit the contract so as to trigger estoppel. *Id.*

There is language in *Weekley*, a recent Texas Supreme Court case, that appears to extend the direct-benefits estoppel doctrine beyond *Bridas*'s holding. Not only is the language *dicta*, but it does not extend the doctrine so far as to change the outcome of this case. In that case, the Texas Supreme Court noted that if a nonsignatory has "'embraced the contract,' . . . the equitable nature of the doctrine may render firm standards inappropriate, requiring trial courts to exercise some discretion based on the facts of each case." *Id.* at 134–35. Thus, the doctrine may allow "a nonparty [to] seek or obtain direct benefits from a contract by means other than a lawsuit." *Weekley*, 180 S.W.3d at 133–35. Despite this broad statement, the court did not extend the doctrine to nonsignatory defendants. Rather, the court emphasized the defensive nature of the doctrine. *Id.* at 133 ("[T]he defensive theory of promissory estoppel . . . does not create liability where none otherwise exists, but 'prevents a party from insisting upon his strict legal rights when it would be unjust to allow him to enforce them.' " (quoting in part *Kellogg*, 166 S.W.3d at 741 n.9)). Although the *Weekley* court bound the nonsignatory party to the contract, the nonsignatory was a *plaintiff* seeking damages related to the contract. *Id.* at 129–30. In *Bridas*, as in *Weekley* but unlike this case, the plaintiff was the nonsignatory and the defendant was the signatory to the

13

contract containing the forum-selection clause.  Neither federal nor Texas courts have extended the direct benefit estoppel theory to bind the nonsignatory defendant in such a circumstance.  IDI, a signatory to the Media Agreement, cannot bind the nonsignatory Fang defendants to the Agreement under the "direct benefits" estoppel doctrine.

### b.     Alter Ego

In response to the Fang defendants' motion to dismiss, IDI argues that those defendants should be held liable as the "alter-ego" of FFGP.  (Docket Entry No. 33 at ¶ 3.08).  The "alter-ego" doctrine is an equitable remedy that "expands the scope of potential sources of relief []."  *In re Texas Am. Exp., Inc.*, 190 S.W.3d 720, 725–26 (Tex. App.–Dallas 2005, no writ).  "[A] corporation may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempt to bind itself alone to its terms, 'when their conduct demonstrates a virtual abandonment of separateness.'" *Bridas*, 345 F.3d at 359 (quoting *Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 777 (2d Cir. 1995)).  In Texas, "the doctrine is applied to disregard the corporate fiction when there is such unity between a corporation and its subsidiary that the separateness of the latter has ceased and holding only the subsidiary liable would lead to injustice." *N. Am. Van Lines, Inc. v. Emmons*, 50 S.W.3d 103, 119 (Tex. App.–Beaumont 2001, *rev. denied*) (citing *Harwood Tire-Arlington, Inc. v. Young*, 963 S.W.2d 881, 885 (Tex. App.–Fort Worth 1998, *writ dismissed*)).

FFPG, however, is not an existing legal entity, (Docket Entry No. 33 at ¶ 2.12), much less a subsidiary of the Fang defendants, (Docket Entry No. 31, Ex. B, Fang Aff. at ¶¶ 9, 20, 31). The "alter-ego" doctrine is inapplicable on the record before this court.

        *c.*    *Agency*

IDI also argues that the Fang defendants should be bound by the Media Agreement because when Payomo and McKibben negotiated and signed the Agreement under the Fang Family Publishing Group trade name, they acted as agents of the Fang defendants. In response, the Fang defendants argue that no legal entity known as the Fang Family Publishing Group exists; that they have never conducted business using that trade name; and that neither collectively nor individually did they authorize Payomo or McKibben to enter into contracts on their behalf using the FFPG trade name.

"Agency is 'the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Bridas*, 345 F.3d at 356–57 (citing RESTATEMENT (SECOND) OF AGENCY § 1(1) (1958)). An agency relationship may be shown to exist by "written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority)." *See Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 536 (5th Cir. 1992); *see also Hester Intern. Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 181 (5th Cir. 1989). Under Texas law, "an individual or entity may act in a manner that makes it liable for the conduct of one who is not its agent at all or who, although an

agent, has acted outside the scope of his or her authority." *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947–48 (Tex. 1998).

IDI argues that Payomo had the authority to contract on behalf of the Fang defendants under the FFPG trade name or, in the alternative, the Fang defendants acted in such a manner as to equitably estop them from denying Payomo's authority to enter into contracts on their behalf under the FFPG trade name.  Under Texas law, the ostensible agent doctrine—an application of estoppel—precludes the denial of a "representation by the principal causing justifiable reliance and resulting harm." *Baptist*, 969 S.W.2d at 947 (citing *Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984)).  In *Baptist*, the Texas Supreme Court adopted the analysis set forth in the RESTATEMENT (SECOND) OF AGENCY § 267.  *Baptist*, 969 S.W.2d at 949.  To prove the elements of liability for ostensible or apparent agency, IDI must show that:  (1) it had a reasonable belief that Payomo had the authority to contract under the FFPG trade name; (2) this belief resulted from some affirmative conduct on the part of the Fang defendants; and (3) IDI justifiably relied on the representation of Payomo's authority.  *Id.*

IDI has offered no evidence to support a finding that Payomo had actual authority to bind the Fang defendants to a contract under the FFPG trade name.  In her affidavit, Fang testifies that after December 2003, "no one was authorized to enter into new contracts on my behalf or on behalf of the selling parties (ExIn, Pan Asia) relating to the *San Francisco Examiner* or other papers being sold to San Francisco Newspaper Company, LLC." (Docket Entry No. 31, Ex. B, Fang Aff. at ¶ 7).  Fang also testifies that "Fang Family Publishing Group" is not a trade name utilized by her, ExIn, or PAVCC.  (*Id.* at ¶ 6).  It is uncontested

16

that FFPG is not listed in California registries as a legal entity.  (Docket Entry No. 33, ¶ 2.12).

As evidence that the Fang defendants conducted business under the FFPG trade name before the Media Agreement was executed, IDI offers the affidavit of Maurice Bresenhan, Jr.  (Docket Entry No. 36, Bresenhan Aff.)  Bresenhan testifies that, based on his review of copies of pleadings in past litigation and Internet research he conducted, it is his opinion that the Fang defendants operated under the FFPG trade name.  (*Id.* at ¶ 1).  A careful review of the record is insufficient to support this conclusory statement.  IDI proffers:  (1) an online news article on the *Asia Week* website that quotes the "Fang family," but does not indicate who such an entity would include and does not refer to the "Fang Family Publishing Group," (Docket Entry No. 35, Ex. 2); and (2) pleadings in a California state case between Scott McKibben, on the one hand, and ExIn, Florence Fang, and James Fang, on the other, (Docket Entry  No. 35, Ex.3).  These pleadings refer to the latter collectively as the "Fang Family." Again, there is no reference to the "Fang Family Publishing Group" as a trade name or otherwise.  Neither is sufficient to give rise to an inference that the Fang defendants operated collectively under the FFPG trade name or that Payomo had the actual authority as an agent to contract for the Fang defendants under the trade name.

As evidence of Payomo's apparent or ostensible authority, IDI offers the affidavit of Richard Gardner, vice-president of IDI.  Gardner testifies that it was his understanding that Payomo and McKibben were acting on behalf of the Fang defendants.  (Docket Entry No. 34, Gardner Aff. at ¶¶ 3–7).  Gardner states that in November 2003, he and Phil Beswick of

IDI's Houston office met with McKibben and Payomo.  (*Id.* at ¶ 3).  Following the meeting, it was Gardner's understanding that McKibben approved going forward with the negotiations regarding the Media Agreement and that he and Beswick were to deal directly with Payomo on behalf of ExIn, PAVCC, and Fang.  (*Id.*).  In later communications with Payomo, Gardner addressed him as, "Mr. Dan Payomo, Vice-President Sales, FANG FAMILY PUBLISHING GROUP."  (*Id.* at ¶ 5).  Gardner testifies that he addressed the letter in this way because Payomo led him to believe that the Fang Family Publishing Group was the appropriate collective name for ExIn, PAVCC, and Fang.  (*Id.*).

This evidence is insufficient to support a finding that the Fang defendants committed an affirmative act that would lead IDI reasonably to believe Payomo had the authority to contract under the FFPG trade name.  Gardner only testifies that it was his belief that Payomo had such authority based on the November 2003 meeting.  Gardner does not identify a representation by McKibben or other officer or representative of the Fang defendants that Payomo had such authority, nor identify other affirmative act that led Gardner to form such a conclusion.

The online article and the pleadings offered by IDI are insufficient for another reason. By their own admission, IDI became aware of the online article and the pleadings only after this litigation commenced.  (Docket Entry No. 33, ¶ 2.12).  IDI could not have reasonably relied  on them to its detriment, and the article and pleadings do not otherwise support an inference of actual or ostensible authority.

The agency theory does not support personal jurisdiction over the Fang defendants. On this record, Payomo had neither actual nor ostensible authority to contract as an agent on behalf of the Fang defendants under the FFPG trade name.

### 2.   Other Bases for Jurisdiction over the Fang Defendants

The Fang defendants are not bound to the Media Agreement, including the forum-selection clause.  The question remains whether the Fang defendants have other contacts sufficient to establish personal jurisdiction.  IDI's jurisdictional argument relies almost entirely on the forum-selection clause within the Media Agreement.  The record discloses no other basis to assert specific jurisdiction and insufficient contacts to support a finding that the Fang defendants had the continuous, systematic, and substantial contacts necessary to support the exercise of general personal jurisdiction.

Florence Fang is an individual who resides in California.  (Docket Entry No. 31, Ex. A, ¶ 1).  Fang has never done business in Texas, has no office in Texas, does not own any real or personal property in Texas, has no bank account in Texas, and has not visited Texas for any reason in the last ten years.  (*Id.* at ¶¶ 4–8).  ExIn is a limited liability company organized under the laws of Delaware with its principal place of business in San Francisco, California. (Docket Entry No. 31, Ex. A, ¶¶ 22–23).  ExIn has no offices in Texas, maintains no registered agent or files in Texas, has no Texas employees, has no real or personal property in Texas, and has no bank accounts in Texas.  (*Id.* at ¶¶ 24–30).  PAVCC is a Delaware limited liability company with its principal place of business in San Francisco, California.  (*Id.* at ¶¶ 11–12).  PAVCC has no Texas office, no Texas employees, and keeps

no files, bank accounts, real or personal property in Texas.  (*Id.* at ¶¶ 13–19).  PAVCC is registered to do business only in California.  (*Id.* at ¶ 13).  IDI has failed to make a *prima facie* showing that SF Newspaper maintained contacts with Texas necessary for this court to exercise general personal jurisdiction.  *See Alpine View Co., Ltd. v. Atlas Copco AB,* 205 F.3d 208, 217 (5th Cir. 2000) (describing substantial, systematic, and continuous presence required for general jurisdiction).

The single contact that IDI alleges with the Fang defendants, other than the execution of the Media Agreement, is the receipt of the Fall 2003 Media Report by Payomo.  As discussed above, the Fang defendants were not signatories to the Media Agreement and are not bound by it.  Although an agent's contacts can be imputed to the principal for the purposes of the jurisdictional inquiry, *see Guyton v. Pronav Ship Mgmt.*, 139 F. Supp. 2d 815, 818 (S.D. Tex. 2001), there is no basis to conclude that Payomo was acting as a agent for the Fang defendants.  Moreover, the mere receipt of the Fall 2003 Media Report in California, presumably in the ExIn officers, cannot, by itself, establish specific personal jurisdiction over ExIn or the other Fang defendants.  By receiving the report, the Fang defendants have not "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).  There is insufficient evidence to find that either specific or general jurisdiction over the Fang defendants exists.

B.      **SF Newspaper Company**

SF Newspaper filed a motion to dismiss for lack of personal jurisdiction and IDI filed a motion to compel arbitration.  SF Newspaper contends that this court lacks personal jurisdiction because it is not a party to the Agreement containing the forum-selection clause and does not have sufficient contacts with Texas to justify the assertion of jurisdiction.  IDI argues that SF Newspaper is a successor-in-interest to the Media Agreement containing the forum-selection clause.  Alternatively, IDI argues that SF Newspaper is bound by the Agreement because it solicited and accepted benefits under the Agreement.

On February 18, 2004, SF Newspaper and Anschutz Printing Company entered into the Purchase Agreement with ExIn, PAVCC, and Florence Fang.  The Purchase Agreement transferred assets and liabilities relating to the printing and publishing business of ExIn, PAVCC, and Fang to SF Newspaper.  The Media Agreement executed between IDI and the Fang Family Publishing Group was neither specifically listed in the asset schedules nor described under the Excluded Assets provisions of the Purchase Agreement.  (Docket Entry No. 11, Ex. A1, at ¶¶ 2.1(a)–(t), 2.3(a)–(q)).  As discussed above, ExIn, PAVCC, and Fang were not party to the Media Agreement, either individually or collectively.  There is no basis to conclude that the Media Agreement was assigned to SF Newspaper under the Purchase Agreement.

Even assuming that the Media Agreement was an interest held by the Fang defendants, under the Purchase Agreement, assignment to SF Newspapers required IDI's written consent.  Section 2.2(a) of the Purchase Agreement states:

>Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any claim or right or any benefit arising under or resulting from such asset if an attempted assignment thereof, without the consent of a third party, would be ineffective with respect to any party to an agreement concerning such asset, or would in any way adversely affect the rights of the Selling Parties or, upon transfer, the Purchaser under such asset.  If any transfer or assignment by the Selling Parties or any other member of the Seller Group to, or any assumption by the Purchaser of, any interest in, or Liability under, any asset requires the consent of a third party, then such assignment or assumption shall be made subject to such consent being obtained.  To the extent any Assigned Contract may not be assigned to the Purchaser by reason of the absence of any such consent, the Purchaser shall not be required to assume any Assumed Obligations arising under such Assigned Contracts.

(Docket Entry No. 11 Ex. A1, at ¶ 2.2).

Section 2.2(a) of the Purchase Agreement expressly states that the purchaser, SF Newspaper, assumes a contract subject to the consent of a third-party if the contract requires such consent.  The Media Agreement conditions assignment on "prior written approval from International Demographics." (Docket Entry No. 12, Ex. 3, at ¶ 12).  Without IDI's prior written approval, SF Newspapers "shall not be required to assume" the Media Agreement.  IDI has neither alleged nor presented any evidence that it gave prior written approval to the transfer of the Media Agreement to SF Newspapers.

IDI alternatively argues that SF Newspaper's solicitation and receipt of benefits under the Media Agreement binds SF Newspaper to the Agreement.  IDI cites *In Re Weekley*, 180 S.W.2d 127, 131 (Tex. 2005), and *In Re Vesta Insurance Group Inc.*, Nos. 04-0141, 04-0156, 04-0157, 04-0165, 04-0179, 2006 WL 662335, *1 (Tex. March 17, 2006).  In each case, a nonsignatory defendant to a contract used the "direct benefits" estoppel principal to bind a

signatory plaintiff to an arbitration agreement.  Here, the signatory plaintiff is seeking to hold a nonsignatory defendant to a contract containing a forum-selection clause.  As discussed above, neither federal nor Texas courts have extended the "direct-benefits" estoppel to bind the nonsignatory in such a circumstance.  Just as IDI cannot seek to bind the Fang defendants to the contract to which they were not a party, IDI cannot seek to bind SF Newspaper to a contract that it did not sign or to which it became bound through a valid assignment.

Finally, IDI argues that, notwithstanding the forum-selection clause, SF Newspaper has had sufficient contacts with the State of Texas to warrant the exercise of personal jurisdiction.  IDI claims that SF Newspaper established sufficient contacts with Texas when it: (1) solicited Media Reports from IDI under the Media Agreement; (2) received Media Reports; and (3) made payments for the receipt of Media Reports to IDI in its Houston, Texas offices.  (Docket Entry No. 19 at ¶ 2.26).

These contacts are insufficient to support a finding that SF Newspaper had the continuous, systematic, and substantial contracts necessary to exercise general personal jurisdiction.  SF Newspaper is a Delaware limited liability company that maintains its principal place of business in San Francisco, California. (Docket Entry No. 11, Ex. A at ¶¶ 5–6).  SF Newspaper is qualified to do business only in Delaware and California; has no office in Texas; maintains no files in Texas; has no registered agent in Texas; has no Texas employees; owns no real or personal property in Texas; has no bank account in Texas; and did not exist before February 10, 2004.  (*Id.* at ¶¶ 7–14).  IDI has failed to make a *prima facie*

showing that SF Newspaper had the quality or quantity of contacts with Texas necessary for this court to exercise general personal jurisdiction. *Cf. Alpine*, 205 F.3d at 217.

Nor does the record support a finding of specific personal jurisdiction. This suit arises out of an alleged breach of contract. To determine specific personal jurisdiction in a breach of contract case, the court must ask whether the nonresident's forum contacts were instrumental in the formation of the contract or its breach. *Burger King*, 471 U.S. at 478; *Religious Tech. Ctr.*, 339 F.3d 369, 375 (5th Cir. 2003) ("In the specific jurisdiction rubric, only those acts which relate to the formation of the contract and the subsequent breach are relevant."). "[M]erely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction." *Freudensprung*, 379 F.3d at 345 (citations omitted). As the Fifth Circuit has stated:

> Although a single act by the defendant directed at the forum state can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted, entering into a contract with an out-of-state party, without more, is not sufficient to establish minimum contacts. Rather, in a breach of contract case, to determine whether a party purposefully availed itself of a forum, a court must evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing . . . .

*Latshaw*, 167 F.3d at 211 (quoting *Burger King*, 471 U.S. at 479). The fact that a nonresident mails contract payments to the forum state or solicits performance under a contract in the forum state does not establish personal jurisdiction over the nonresident. *See Freudensprung,* 379 F.3d at 344 ("[T]his Court has repeatedly held that the combination of mailing payments to the forum state, engaging in communications related to the execution

24

and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident defendant"); *Holt*, 801 F.2d at 778 (finding no specific jurisdiction over nonresident defendant when that defendant entered into a contract with a Texas resident, sent an agreement and checks to Texas, and engaged in extensive telephonic and written communication with the plaintiff in Texas).

SF Newspaper's contacts with IDI were primarily through Richard Gardner, who negotiated the original contract and provided training sessions for SF Newspaper. The fact that Gardner works out of IDI's California offices, (Docket Entry No. 34, Ex. 1 at ¶ 1), and that the training provided took place in SF Newspaper's California offices, (Docket Entry No. 34, Ex. 2 at ¶ 6), weigh against the exercise of jurisdiction by a Texas court. Although the Media Reports may have been produced in Texas and payment was sent to Texas, these facts do not warrant the exercise of personal jurisdiction by a Texas court. The fact that a Texas resident performs its contractual obligations in Texas does not create jurisdiction over a nonresident party in Texas. *See V.F., Inc. v. Pro Metals, Inc.*, 60 S.W.3d 320, 327 n.10 (Tex. App.–Houston [14 Dist.] 2001, rev. denied). The contacts that IDI cites do not support a finding of personal jurisdiction.

**III.    Conclusion**

The motions to dismiss for lack of personal jurisdiction filed by ExIn, PAVCC, Florence Fang, and SF Newspaper are granted.  An order of dismissal is separately entered.

SIGNED on July 10, 2006, at Houston, Texas.

_____

Lee H. Rosenthal

United States District Judge